Filed 10/17/14  In re J.S. CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. |  |
| YOLO COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Q.S.,<br><br>Defendant and Appellant. | C074723<br><br>(Super. Ct. Nos. JV12441, JV12443) |

Q.S., father of the minors J.S. and H.S., appeals from the juvenile court's jurisdictional and dispositional orders.  (Welf. & Inst. Code, §§ 360, subd. (d), 395.)[1] Father contends there was insufficient evidence to sustain the jurisdictional finding he

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

intentionally caused the death of his child, S.S. He further contends there was insufficient evidence to support the juvenile court's orders removing the children from his custody, denying him reunification services, and decreasing his visitation.

We conclude the juvenile court's jurisdictional finding, that father intentionally inflicted S.S.'s fatal injuries, is supported by substantial evidence. We also conclude substantial evidence supports the juvenile court's orders removing the children from father's custody and denying father reunification services. As to visitation, we conclude father has forfeited this contention. Accordingly, we affirm the juvenile court's orders.

BACKGROUND

*Petition/Detention*

On October 9, 2012, the Yolo County Department of Employment and Social Services (Department) filed petitions for J.S. born 2010 and H.S. born July 2012, alleging both children were at risk of abuse or neglect because of injuries suffered by their sibling S.S. also born July 2012, allegedly caused by one or both of the children's parents.[2] The following day the children were removed from the parents and later placed with their maternal grandparents.

On October 9, 2012, S.S. died in the hospital. The Department then amended the petitions to allege the surviving siblings, J.S. and H.S., were at risk because the children's parents caused the death of S.S. (§ 300, subd. (f).)

In March 2013, the Yolo County Sheriff/Coroner's Office completed the autopsy report on S.S.'s death. The manner of death was determined to be homicide, caused by "severe traumatic brain injury and bilateral neuro-ocular injury (acute and chronic)" described as "recurrent brain injuries."

---

[2] H.S. and S.S. were twins.

2

The petitions were amended a third time in April 2013 to include an advisory that the Department would rely on section 355.1, subdivision (a), to establish jurisdiction.

## Contested Jurisdictional Hearing

The contested hearing on jurisdiction began April 29, 2013, and lasted seven days. The following evidence was admitted at that hearing:

### A.

### Father's Testimony

On September 5, 2012, father returned home from work around 5:00 p.m. Approximately 30 minutes later, mother left for her job coaching soccer. After mother left, father set a sleeping S.S. in the middle of their king-sized bed, toward the middle, on his back. H.S. was buckled in a swing. J.S. was walking between the living room and his bedroom, about five steps from the parents' bedroom, playing. Father testified J.S. would often hug the twins and try to pick them up.

According to father's testimony, after he set S.S. down on the bed, he went to the front porch and took a stroller to the garage. When he returned to the master bedroom, he found S.S. face down on the hardwood bedroom floor. When father picked up S.S., he was limp and his breathing sounded more like "humming." Father held S.S. and rocked him but S.S. remained limp. Father testified S.S. opened his eyes and moved a bit, but was not crying and did not make any noise.

Father then called mother. He told mother S.S. fell, he was worried, and she should hurry home. Father returned to watching S.S., and according to father, S.S. eventually began to breathe and move more normally. As he walked around with S.S., father said he saw J.S., whose speech development was delayed and who was not yet able to speak, standing in the corner of his room doing nothing.

3

Mother soon arrived home. She took S.S. from father and examined him. According to father, by then S.S. was better but still did not appear "normal." He was not alert and was crying "softly." J.S. was still in his room; H.S. was still in the swing. Mother and father took S.S. to the closest emergency room, approximately 20 minutes away.

When they arrived at the emergency room, father carried S.S. inside in his car seat. S.S. was awake, more alert, and not crying. Father told the intake person S.S. had fallen off the bed. About 30 minutes later, someone took S.S.'s vital signs and weighed him. Father and S.S. continued to wait for a doctor but nurses continued to check in, saying everything looked good. Eventually, a doctor examined S.S. and told father S.S. was "okay" and sent the family home without further testing.

Around 5:00 a.m. the following day, S.S. vomited most, if not all, of the bottle father fed to him. Father went back to bed. When he awoke, mother told him she fed S.S. again and he vomited again. In the following days, S.S. continued to vomit after eating. On September 7, 2012, mother and father e-mailed S.S.'s pediatrician (Dr. Otani) with their concerns. That day, father took S.S. to Dr. Villalobos, who was recommended by Dr. Otani.

Father told Dr. Villalobos about the fall and the projectile vomiting since the fall. While Dr. Villalobos observed father feeding S.S., S.S. did not vomit. Dr. Villalobos suggested the vomiting might be a result of overfeeding S.S., or maybe he had a virus that was causing stomach problems. Dr. Villalobos discussed doing a CAT scan on S.S. and consulted with an off-site neurologist, but ultimately Dr. Villalobos recommended against the scan. She and the neurologist were concerned about exposing S.S. to the radiation because "with the symptoms that we're seeing, [the neurologist] didn't believe

4

one needed to be done." She sent father and S.S. home, and recommended the parents feed him less and make sure he was sitting up when they fed him.

S.S. continued to vomit after eating. On September 11, 2012, father e-mailed Dr. Otani because S.S. became unusually upset while he and mother were changing his diaper and then went limp. Father described S.S.'s condition as similar to when father found him on the floor six days earlier. According to father, S.S. would "flop" over when held, he was unresponsive and did not make eye contact, and his breathing sounded more like "humming." This "episode" lasted about five minutes.

Dr. Otani responded to father's e-mail the following day. Dr. Otani characterized S.S.'s behavior as a "coping mechanism" for kids who get really upset. Father and mother continued to e-mail back and forth with Dr. Otani to try to determine why S.S.'s symptoms were occurring and what could be done to stop the symptoms. At that time, Dr. Otani did not recommend a CAT scan or EEG for S.S. After that day, S.S.'s vomiting decreased and he did not have another episode of "limpness" until October 3, 2012.

On October 3, 2012, father left for work without feeding either twin. Father returned home around 5:00 p.m. and mother left for soccer practice. Around 6:00 p.m., father fed S.S., swaddled him, then put S.S. in the swing after S.S. fell asleep. Approximately one hour later, father checked on S.S. and saw S.S.'s head was hanging off to the side and his breathing sounded like humming. Father took S.S. out of the swing, massaged his legs and arms, and patted him on the back for about five minutes. S.S. did not respond. Father continued to hold S.S., who remained unresponsive, and called 911. Father called mother as soon as S.S. was taken to the emergency room. Father rode in the ambulance with S.S. and did not see him regain consciousness. S.S. died six days later on October 9, 2012.

### *Mother's Testimony*

Mother's testimony was consistent with father's: she left the family home to coach soccer around 5:00 p.m. on September 5, 2012, and no one was home with the children other than father. Father called her around 7:45 p.m. He was "scared." Father told mother he found S.S. face down on their bedroom floor.

When mother got home, she found father holding S.S. in a blanket. She took S.S. from father and looked him over. He appeared conscious. She saw no blood or "anything" but observed S.S. was "kind of whimpering" and breathing "a little different." Mother did not see S.S. lose consciousness, but father told her S.S. was "out of sorts" for three to five minutes after the fall. After consulting with their firefighter neighbor, father took S.S. to the emergency room. Mother stayed in contact with father while he was in the emergency room with S.S. To the best of her recollection, they returned home around 9:15 p.m.

Mother testified father later explained he did not know what had happened to S.S. before father found him on the floor. Father thought J.S. might have gone into the bedroom, climbed up onto the bed, and pulled S.S. to the floor -- three feet below. Mother remembered seeing J.S. pull himself up onto their bed before September 12, 2012. She also described a bench at the foot of their bed, which J.S. also could have used to climb onto the bed.

Mother confirmed father's testimony that on September 6, 2012, S.S. began projectile vomiting, so they contacted Dr. Otani, who suggested they see Dr. Villalobos because Dr. Otani was unavailable. Mother also testified Dr. Villalobos believed the vomiting was a stomach issue, not related to the fall, and no testing was ordered. S.S.'s

vomiting decreased and both parents stayed in contact with physicians. A follow-up appointment was scheduled on September 10, 2012.

On September 10, 2012, S.S. received immunizations. Mother was warned S.S. would be irritable and more tired for the next couple of days. On the following day, S.S. went limp while mother and father were changing his diaper. Mother remembered they contacted Dr. Otani and described S.S.'s symptoms, but Dr. Otani reassured them S.S. was okay and did not order any tests. Mother expressed her concern to Dr. Otani that S.S. was not tracking with his eyes. Dr. Otani told her not to compare S.S. with his twin brother H.S.

Mother also testified J.S. was loving toward his twin brothers and tried to "engage" them. She described how J.S. would often try to lift one of the twins, but mother or father would intervene and make J.S. sit down while they helped him hold his brothers. J.S. was a typical two year old who was not rough with his brothers, but not able to "gauge" his behavior.

Mother described herself and father as "even keel." Their relationship was "great," and she had never seen father act violently or aggressively toward any of their children. She viewed theirs as a family without problems.

### C.

### *Medical Testimony Presented by the Department*

#### 1. *Dr. Kevin Coulter*

The juvenile court found Dr. Coulter qualified as an expert on issues related to the diagnosis or finding of physical child abuse. He testified that on October 3, 2012, S.S. was transferred from Woodland hospital to the University of California at Davis Medical Center (UCDMC). Tests and clinical observations at UCDMC showed S.S., who was not responding normally to stimulation, had suffered a head injury and was having

7

uncontrollable seizures. Testing showed fluid collected around S.S.'s brain. The blood accumulating around S.S.'s brain was of varying ages: some of the blood had accumulated within three to seven days prior to admission and some of the blood was at least two weeks old.

In Dr. Coulter's expert opinion, the acute blood found in S.S.'s brain could not have been directly caused by the fall that occurred a month prior. He also said it would be unusual to suffer the bilateral subdural hematomas found in S.S.'s brain by falling from a bed. He acknowledged he had seen such injuries from a fall, but typically the child's injuries were not as bad as S.S.'s injuries. Dr. Coulter also acknowledged such an injury could produce "re-bleeds" in the brain, but in his opinion, S.S.'s injuries were not "re-bleeds." Dr. Coulter characterized the bleeding in S.S.'s brain as "lots of bleeding all over, and in association with an abrupt, extremely abrupt onset of . . . symptoms that were rapidly worsening."

Dr. Coulter also testified X-rays performed at UCDMC revealed bilateral, posterial rib fractures that, in his opinion, "carry with them significant specificity for child abuse, particularly in infants." The rib fractures were healing but were difficult to date. After consulting with a cardiologist, Dr. Coulter estimated the fractures were about one to three weeks old. He opined it would be "very unusual" for these types of fractures to occur in a fall. Dr. Coulter testified the general consensus was that head injuries with this type of subdural bleeding, accompanied by these types of rib fractures, were the result of squeezing and compressing forces. He also said it would be highly unusual for these rib fractures to have been caused by J.S. falling on top of S.S. after S.S. fell off the bed, particularly because the fractures were bilateral.

Dr. Coulter also testified S.S. had retinal hemorrhages when he arrived at UCDMC on October 3, 2012. A formal evaluation of S.S., done four days later, revealed

8

S.S. had extensive retinal hemorrhaging in both eyes, involving "multiple layers of the retina." Dr. Coulter opined the hemorrhaging could have been caused by the brain bleed but said such extensive hemorrhaging, affecting multiple layers of the retina, would not typically be caused by a brain bleed. The current thinking on such eye injuries, he testified, is that they occur during acceleration/deceleration movements that pull on the retina. In his expert opinion, S.S.'s injuries were intentionally inflicted.

On cross-examination, Dr. Coulter acknowledged S.S.'s behavior after September 5, 2012, was consistent with a child suffering an acute brain bleed. He also acknowledged he initially informed law enforcement officers S.S.'s rib fractures were caused by his brother falling on him and there were documented cases of fatal impact injuries caused by subdural hematomas. He further acknowledged there were studies that showed retinal hemorrhaging and subdural bleeding occurring from a "crush" injury.

Dr. Coulter agreed it was unusual S.S. could be shaken so violently but have no resulting neck injury. He also agreed a good deal of research showed bleeding can accumulate over time and cause a pressure effect, and acknowledged S.S.'s head had grown from the 28th percentile in July 2012 to the 60th percentile in September 2012. However, in Dr. Coulter's opinion, S.S.'s injuries occurred because S.S. was grabbed by the rib cage and shaken so violently it fractured his ribs and resulted in numerous head injuries.

### 2. *Dr. Ikechi Ogan*

The juvenile court found Dr. Ogan qualified as an expert on issues related to forensic pathology. Dr. Ogan also conducted part of the autopsy on S.S. on October 11, 2012. S.S.'s autopsy revealed two small contusions on S.S.'s forehead. Two other, much smaller, injuries were found inside S.S.'s scalp. Dr. Ogan opined these injuries were caused by some degree of impact to S.S.'s head at these points. He noted the injuries

9

were between 72 hours to five days old at the time of the autopsy. Dr. Ogan also confirmed S.S. had two rib fractures, both in the healing phase, though he could not date the fractures without additional examination and evaluation.

Dr. Ogan further testified a different pathologist performed a specific examination of S.S.'s brain. Dr. Ogan did, however, observe there was a large amount of different-aged blood inside S.S.'s skull. The older blood was at least two weeks old at the time of the autopsy and had stained the brain, the skull, and the subdural surface. Dr. Ogan also noted there had been bleeding into the optic nerve, bleeding that he attributed to trauma. In Dr. Ogan's opinion, S.S.'s death was the result of a severe traumatic brain injury and bilateral neuro-ocular injury that was acute, chronic, and recurrent. In his opinion, because of the numerous and varying injuries S.S. suffered, the fatal injuries could not have been caused by a fall a month earlier.

On cross-examination, Dr. Ogan agreed S.S.'s head injuries, which were the result of blunt force trauma, could have been caused by a fall, as well as by violently shaking S.S. He also testified that if a child was shaken violently back and forth, the pivot point would be the child's neck and S.S. had no neck injuries. He opined S.S.'s head growth around September 2012 was due to bleeding into his head during that time.

### 3. *Dr. Bennet Omalu*

Dr. Omalu performed the autopsy on S.S.'s brain. The juvenile court qualified him as an expert on issues related to forensic pathology and neuropathology. In his expert opinion, S.S. suffered a traumatic brain injury. Dr. Omalu described S.S.'s brain as "markedly swollen with large amounts of water on the brain." He also found contusions in the "front of the lobes and temporal ports indicating trauma, blunt force trauma and in addition to bilateral subdural hemorrhages and interhemispheric hemorrhages."

Dr. Omalu described a "pattern of constellation of multiple traumas" in S.S.'s brain. He noted an "axon" had been "sheared, . . . torn apart," resulting in multifocal "spheroids," from which the only conclusion could be S.S.'s traumatic brain injury was a severe acceleration/deceleration injury. Moreover, he found, S.S.'s brain "showed evidence of bilateral subdural hemorrhages in the optic nerves and bilateral retinal hemorrhages on both sides accompanying b[i]retinal detachment." This type of retinal hemorrhaging is "strongly indicative of physical injury, traumatic injury."

In his opinion, the types of injuries suffered by S.S. were caused by a sudden change in movement that caused the brain to bounce up and down inside the skull "in an oscillatory fashion." Dr. Omalu described S.S.'s injuries as "severe" and "traumatic . . . , the highest class of traumatic." In his opinion, these injuries were unlikely to be caused by a fall from three feet onto a hardwood floor, though he could not be absolutely certain because "medicine is not an absolute science."

On cross-examination, Dr. Omalu opined the injuries to S.S.'s brain could not have been inflicted a month before he was admitted to the hospital because: (1) it was medically impossible for such massive brain swelling to be present for a month and (2) the injuries to S.S.'s eyes were "acute" and, in his opinion, had to have occurred just before S.S. was admitted to the hospital.

## D.

### *Medical Testimony Presented by Father*

Dr. John Plunkett testified on father's behalf as an expert on issues regarding forensic pathology in general and forensic pathology as it relates to infant injury evaluation. Dr. Plunkett described several medical studies and concluded there was no scientific evidence one could shake an infant to the point of injuring the infant's brain without also injuring the child's neck. He also cited a study that concluded if a person

11

were to shake an infant to the point of brain damage, it would "almost literally decapitate that infant." Dr. Plunkett cited other medical studies that concluded retinal folds and tears can be caused by crushing injuries or accidental injuries.

In addition to the studies cited above, Dr. Plunkett described a case study where an infant died three days after a short fall from a bed, and another where an infant fell down a flight of stairs and suffered a fatal and acute head injury that included detached retinas. He also opined S.S.'s retinal detachment was not a result of being shaken, but a "post-mortem artifact" caused by the autopsy. In his opinion, S.S.'s injuries were the result of an "impact."

Dr. Plunkett also noted that "radiographic and autopsy findings," as well as the lack of any visible acute injury, indicated S.S.'s injuries occurred three to four weeks prior to his admission to the hospital. He said rib fractures in infants were more common than people believed, and S.S.'s could have been the result of something that happened before September 2012, even as far back as S.S.'s birth. He also testified S.S. had a Vitamin D insufficiency, which would delay healing and further complicated dating the injuries.

Dr. Plunkett also observed the bleeding in S.S.'s brain included a large volume of chronic bleeding, which would have taken three to four weeks to develop. Moreover, based on his review of S.S.'s medical records, much of the blood surrounding S.S.'s brain was old blood, blood that was three or four weeks old. The new blood, in his opinion, was the result of new blood vessels that formed in the original "hematoma," that can rupture and bleed, causing a subdural hematoma to develop. Such new blood offered no help in dating S.S.'s injuries because they were secondary to the original injury. On the other hand, Dr. Plunkett also noted that, in his opinion, the image studies demonstrated

12

the natural history of a chronic subdural hematoma, which, when sufficiently large, will cause irritability and vomiting.

Dr. Plunkett also disagreed with the Department's expert testimony. He disagreed with Dr. Ogan's method for measuring the blood in S.S.'s brain. He also criticized Dr. Omalu's conclusion the "cortical vein thrombosis" was evidence S.S. had bruises on the surface of his brain. In Dr. Plunkett's opinion, what Dr. Omalu saw as bruises were actually "venous infarcts" or "thrombose blood vessels." In Dr. Plunkett's opinion, this was further evidence S.S.'s injuries were weeks old and healing. Dr. Plunkett agreed with Dr. Omalu's conclusion S.S. had axonal injuries that were "sparse." However, in Dr. Plunkett's opinion, the distribution of axonal injuries was caused by a lack of oxygen, not trauma.

Based on his experience and his review of S.S.'s records, in Dr. Plunkett's opinion, S.S.'s injuries could have been caused by a fall off the bed. Such a fall would have resulted in a small brain bleed, which expands over time. He himself had seen around 50 cases of infants with a "chronic subdural hematoma" that remained asymptomatic for up to four months after the injury was sustained. In his opinion, the medical data showed S.S. suffered his injuries on September 5, 2012, and those injuries resulted in the intractable seizures on October 3, 2012. Ultimately, S.S. died as a result of those seizures. In conclusion, he opined, "there is really no evidence that anything other than an accidental fall on September 5 caused [S.S.'s] death."

### E.

#### *Character Testimony*

Several witnesses testified on behalf of father, saying he was an even-tempered, loving parent, a man who found parenting to be "a pleasure . . . not a task," and the kind of man who should be a parent. Father was described by at least one witness as "very

patient, very calm, very attentive, [and] very fun loving," and those traits did not change after the twins were born. Another witness described him as a caring, compassionate, "amazing person." Another witness, who was a regular visitor in the family's home, said she never saw bruises or injuries on any of the children; there was never any indication the children were being neglected or abused.

Mother's sister described both mother and father as calm and patient parents. In the 15 years she had known father, she had never seen him act aggressively. She described S.S. as a sweet baby who was not "colicky," and she remembered seeing J.S. get up on the parents' bed by climbing on a bench at the foot of the bed.

Mother's sister confirmed that after September 5, 2012, S.S. had to be fed more often because he was not keeping his food down, and she had personally seen him vomit on two occasions. She noticed S.S.'s eyes were not "tracking." She also noticed mother and father were more solicitous of S.S. after September 5, 2012, because of his ongoing symptoms.

Witnesses also testified there was no apparent conflict between father and mother, they were a happy family, and father's reputation in the community did not include a reputation for aggression or impulsiveness. People were known to regularly just drop in on the family to visit, often without advance notice, and the parents' family members were frequently in and out of the family's home.

Jaclyn Garton, the case social worker, testified an exam of S.S.'s siblings, H.S. and J.S., revealed no signs of either child being abused. She also testified that other than S.S.'s injuries and ultimate death, there was no evidence either H.S. or J.S. was at risk in their parents' care. According to Garton, the Department had no medical concerns regarding either H.S. or J.S. Moreover, after extensive interviews with friends and

family, the Department found nothing "definitive" to suggest either parent had a motive to harm S.S.

## F.

### *Social Worker Testimony*

In the jurisdiction report, Garton noted that during the investigation, father responded, "So the first time *I did it* was do you want an exact date" to the detective's question about when he first saw S.S. go limp. (Italics added.) When questioned, Garton stated she spoke with the detective but had not actually listened to father's interview with the detective. She agreed there were other interpretations of the statement father made that would not be an admission of guilt. In addition, Garton testified that based on psychological testing and examination of father, it was an "extremely low probability" he would on multiple occasions inflict injury on his children.

Garton also agreed father and mother relied on medical advice that, after S.S. was found on the bedroom floor, he was fine and needed no further tests. In conclusion, Garton testified if S.S.'s death was determined to be accidental, the Department would return the children to both parents and dismiss the petition.

## G.

### *Closing Arguments*

In closing, the Department argued that, as shown by the evidence, S.S. suffered from "bilateral subdural hematomas, brain damage, bilateral hemorrhaging of the retinas, detachment of the retinas, and rib fractures." According to the Department's experts, the injuries could not have been caused by a re-bleed, nor could they have been caused by intracranial pressure. Rather, according to the Department's experts, these injuries were most likely caused by abusive head trauma -- not a fall from the bed. Accordingly, the

15

Department met its burden of showing by a preponderance of the evidence S.S. was injured by nonaccidental means, and thus H.S. and J.S. were at risk in their parents' care.

In closing, father relied on Dr. Plunkett's testimony to discredit the Department's experts. Father argued that, according to Dr. Plunkett, modern science rejects the notion this particular combination of brain injuries can be caused only by shaking a baby, and certainly not without also injuring the child's neck. Father argued that physics rendered such a result impossible. According to father, current research suggests such a combination of injuries can also be caused by an accidental fall and the Department's experts simply chose to ignore more current information.

Moreover, father argued, 10 witnesses described father and mother as parents devoted to their children and who love their children. There was no evidence father had any motive to harm S.S., or that he would harm H.S. or J.S. Father argued the more reasonable interpretation of the evidence was that somehow J.S. pulled S.S. off the bed on September 5, 2012, and that fall caused the injuries that ultimately resulted in S.S.'s death. It was far less reasonable to infer father had violently shaken S.S.

## H.

### *Jurisdictional Findings and Orders*

In issuing its decision, the juvenile court took a "step back" from the detailed medical evidence. The court found the fundamental question to be: "[H]ow did [S.S.] suffer his fatal injuries?" The court also offered only three possible scenarios to answer that question: (1) two-month-old S.S., somehow managed to roll himself off of the bed; (2) someone else accidentally caused S.S. to fall off of the bed; or (3) the injuries were intentionally inflicted.

The court rejected the first scenario because S.S. causing himself to fall off the bed was a virtual impossibility. The court also rejected the second scenario as "illogical."

16

The court found the possibility father accidentally caused S.S. to fall off the bed was not supported by any evidence. Furthermore, the court found the theory that J.S. could have pulled S.S. from the bed to the floor "preposterous."

According to the court, "[i]t is simply not physically possible for J.S. to leave his room or the living room, wherever he was at the time that [father] exited the bedroom, go in to the master bedroom where S.S. was sleeping, climb up on the bench, climb up on the bed, and then carry or roll or push S.S. to the edge of the bed, drop him to the floor, fall on top of him, and then return to his room.

"The fact that [S.S.] was asleep at the time that [father] left the bedroom means that there wasn't even any reason why [J.S.] would have occasion to enter the master bedroom. It is not like he had a younger brother who was active and maybe could be seen as a play thing, the baby is asleep.

"I find this theory, this suggestion is physically impossible, and if not that at the very least illogical."

Moreover, the juvenile court found Dr. Plunkett's theory, that S.S. could have suffered his injuries in a fall, was not supported by the evidence because Dr. Plunkett could not explain the rib fractures. Because Dr. Plunkett's theory did not explain all of S.S.'s injuries and there was no reasonable interpretation of the evidence that resulted in S.S. falling from the bed, the court was not persuaded S.S.'s injuries were caused by a fall from the bed.

The court thus concluded the only reasonable explanation for S.S.'s injuries, based on the evidence admitted, was that they were intentionally inflicted. The court looked at the evidence of S.S.'s numerous injuries and agreed with the Department's experts that the only conclusion to be reached was that the injuries were intentionally inflicted. Furthermore, the only person "who had the ability" to inflict those injuries was father.

Accordingly, the court ruled the evidence established father intentionally injured S.S., not only by a preponderance of the evidence, but by clear and convincing evidence.

The juvenile court thus sustained the allegations in the petition, except the court found mother had not failed to do everything she could to care for all three children. The court thus modified the prior order for visitation and permitted mother to move in with the maternal grandmother, where the children were placed. The court further modified the prior order for visitation, over father's objection, and reduced father's time with the children to twice-weekly visits at the supervising agency. The court set the disposition hearing for May 22, 2013.

## I.

### *Dispositional Findings and Orders*

In its disposition report, the Department recommended father be denied reunification services because he "caused the death of another child through abuse or neglect."[3]  (§ 361.5, subd. (b)(4).)  In recommending father be bypassed for services, the Department noted father remained "adamant" he did not cause S.S.'s death. Accordingly, the Department concluded, reunification services to father would place H.S. and J.S. at risk for abuse or neglect.

At the contested disposition hearing, father presented the testimony of Dr. Donald Siggins, who performed a bonding study on father, H.S., and J.S.  Dr. Siggins concluded, based on his study, both children were very attached to father -- especially J.S.  Dr. Siggins opined that if the children were not reunified with father, the psychological cost

---

[3]     The Department initially recommended mother be bypassed for services as well, noting she continued to "stand by" father and the two of them continue to "perpetuate a lie." The Department later changed its position with respect to mother and recommended she receive reunification services.

18

would be high, particularly for J.S. H.S., he testified, would be able to forget father, but his self-esteem would be affected. J.S. on the other hand, would be at risk "of lifelong psychological problems." Dr. Siggins noted J.S.'s health had been in decline since the reduction in visitation with father and opined his health would only improve if father's visitation was greatly increased.

The maternal grandmother also testified J.S. was "confused" by his father's absence, sometimes becoming "distressed."

The Department offered testimony through social worker Kathleen Clemons who, among other things, testified, as far as she knew, no one from the Department had spoken with father to discuss the matter with him.

Father argued the only evidence admitted at the hearing was that the children were suffering from limited contact with father and would suffer further without reunification. Father further argued the Department conducted no investigation into whether father should be offered services, relying instead on its speculation about the parents' views on what happened to S.S. The children's counsel agreed father should be offered reunification services because it would be in the children's best interests.

The juvenile court subsequently ordered family maintenance services for mother, with whom the children were already living. The court, however, denied reunification services for father. The court found this was not a "rare" case where services should be offered despite the finding father caused the death of another child. The court acknowledged J.S. and H.S. would suffer at the termination of services for father, but stated it was the court's obligation to ensure the children were physically protected. From the court's perspective, "as long as [father's] position remains one of denial for his responsibility in [S.S.]'s death, there is no way that he could possibly convince me that the boys could be protected." The court thus denied reunification services and asked the

19

Department to recommend whether visitation should be terminated, reduced, or continued under specified circumstances.

Father was subsequently arrested and incarcerated. The Department recommended father receive no visits with the children until he was released from jail. After he was released, father requested visitation with the children three times a week at the maternal grandmother's home. The children's counsel was in agreement. The Department, however, asked that the order for visitation be reduced to two-hour visits, twice weekly. The court ordered visits as requested by the Department. Mother's counsel argued the reduced visitation was harmful to the children. The court then modified its order, further reducing father's visitation to four hours weekly, every other week; father would have two hours weekly on the alternate weeks.

## DISCUSSION

### A.

### *The Jurisdictional Findings and Orders*

Father contends there was insufficient evidence to support the juvenile court's finding he intentionally caused S.S.'s death. In support of his contention, father argues the court reached its finding "by disregarding any evidence about [father's] intentions or motivations, and assuming time and motion analysis that was not presented by any party and could not be rationally inferred from the time or distances involved, absent competent testimony on the issue." We are not persuaded by father's argument and conclude there was sufficient evidence to support the jurisdictional findings.[4]

---

[4] We agree the juvenile court did not make the predicate finding that the injuries suffered by S.S. were the type that could not have been caused except by the parent. (§ 355.1.) Accordingly, there can be no presumption under section 355.1 that father caused the injuries that resulted in S.S.'s death.

20

"At the jurisdictional hearing, the court determines whether the minor falls within any of the categories specified in section 300. [Citation.] ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction." ' [Citation.] On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) If two reasonable inferences are to be drawn from the evidence, one that supports the juvenile court's decision and one that does not, the reviewing court must rely on the first inference. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako*).)

Here, there was credible expert evidence regarding the cause of S.S.'s injuries and his death. The Department's experts opined S.S.'s death could be caused only by shaking S.S. violently. Father's expert opined that was a physical impossibility and the more likely scenario was S.S. was injured falling from his parents' bed. The juvenile court found the Department's expert testimony better explained S.S.'s injuries. On appeal, we cannot decide the alternate theory offered by father, that S.S. was injured in a fall, is the more reasonable explanation. (*Misako R., supra,* 2 Cal.App.4th at p. 545.)

Moreover, the juvenile court found father's theory J.S. somehow pulled S.S. from the bed to be "preposterous." Father now argues this finding is a "combination of [the court's] own assumptions, unsupported by evidence, or own presumptions about young children, which [father] suggests are contrary to the common experience of most parents and the percipient testimony of actual witnesses." We disagree.

21

First, there was no "percipient testimony of actual witnesses" regarding the cause of S.S.'s injuries. Father testified he did not see what happened to S.S. on September 5, 2012. Although mother testified she had previously seen J.S. climb onto his parents' bed and, in other situations, try to lift his brother, there is no evidence J.S. climbed on the bed or lifted his brother on September 5, 2012. And J.S. did not testify; he was not able to speak due to delayed speech development.

Second, the juvenile court's findings are supported by the evidence. The juvenile court was aware J.S. was two-and-a-half years old, heard testimony about where J.S. was in relation to the master bedroom, and heard father's testimony he was outside for only as long as it took to move a stroller from the front porch to the garage. It is not unreasonable for the court to infer from this evidence it was physically impossible for J.S. to go into the master bedroom, climb on the bench, climb on the bed, push or pull S.S. to the floor, fall on top of S.S. (cracking his ribs), then walk back into his own bedroom before father returned. Contrary to father's claim on appeal, this evidence is sufficient to support the juvenile court's conclusion, particularly when the court already had concluded S.S.'s injuries could not have been caused by a fall from the bed.

We conclude the juvenile court's jurisdictional finding, that father intentionally inflicted S.S.'s fatal injuries, is supported by sufficient evidence.

### B.

### *The Dispositional Findings and Orders*

Father contends substantial evidence did not support the juvenile court's orders to remove the surviving siblings from father's custody, bypass reunification services for father, and ultimately reduce father's visitation with H.S. and J.S.

22

### 1. *Substantial Evidence Supports Removal*

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.' [Citation.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

Here, the juvenile court found, by clear and convincing evidence, father intentionally inflicted the injuries that caused the death of H.S. and J.S.'s sibling, S.S. By the time of the disposition hearing, father continued refusing to take responsibility for S.S.'s death and refused to discuss with the Department the circumstances surrounding S.S.'s injuries and death. There is, therefore, sufficient evidence to support the juvenile court's finding that "as long as [father's] position remains one of denial for his responsibility in S.S.'s death, there is no way that he could possibly convince me that the boys could be protected." We conclude there was sufficient evidence supporting the juvenile court's decision to remove H.S. and J.S. from father's care.

### 2. *Substantial Evidence Supports Denial of Services*

Reunification services are normally offered to parents whose children are removed from their custody to eliminate the conditions leading to removal and to further the goal of preserving the family whenever possible. (§ 361.5, subd. (a); *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) However, the juvenile court need not offer reunification services if clear and convincing evidence shows conditions exist that would make it futile or detrimental to the minors to attempt reunification. (§ 361.5, subds. (b)(2)-(15), (e)(1); *In re T.M.* (2009) 175 Cal.App.4th 1166, 1171-1172.) Even where grounds exist to bypass services under section 361.5, subdivision (b), the court may offer

services if it finds by clear and convincing evidence reunification is in the children's best interests. (§ 361.5, subd. (c).)

We review an order denying reunification services for substantial evidence. (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914; *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880.)

Under section 361.5, subdivision (b)(4), the juvenile court may deny reunification services to a parent who has caused the death of another child. As discussed above, the juvenile court found father intentionally caused the death of H.S. and J.S.'s sibling, S.S. In order to receive reunification services at the disposition hearing, it was father's burden to prove by clear and convincing evidence reunification would be in the children's best interests. (§ 361, subd. (c).) Father did not meet his burden.

In the disposition report, the Department found father did not accept responsibility for causing S.S.'s injuries and, ultimately, his death. The parents were unwilling to discuss the events surrounding S.S.'s death with the Department.[5] Father offered testimony, including expert testimony, that his failure to reunify with H.S. and J.S. would cause both children psychological harm to varying degrees. The juvenile court acknowledged this harm. The court nevertheless found that until father took responsibility for causing S.S.'s death, the risk of physical harm to H.S. and J.S. was too great; and concluded reunification was not in the children's best interests.

---

[5] In his reply brief, father argues the disposition report is insufficient evidence for the removal order because it was based on father's denial of responsibility for S.S.'s death and the social worker did not interview father about his son's death. However, the lack of an interview with father does not mean the report is based on speculation. Rather, based on father's refusal to discuss his son's death, it is reasonable to infer he was not taking responsibility.

On this record, we conclude the juvenile court's decision to deny reunification services is supported by substantial evidence.

### 3. *Reduction in Visitation*

In his opening brief, father asserts the juvenile court abused its discretion in reducing father's visitation. Father does not present any argument to support this claim, instead limiting his arguments to removal and bypass of services. Accordingly, the claim is forfeited. (*People v. Hardy* (1992) 2 Cal.4th 86, 150 [a reviewing court need not address any issue purportedly raised without argument or citation to relevant authority].)

### DISPOSITION

The orders of the juvenile court are affirmed.


       HOCH     , J.


We concur:


     BLEASE    , Acting P. J.


   NICHOLSON  , J.